**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jose Mari PADILLA–MARTINEZ, Jose Rodrigues-Martinez, Carlos Alfonso Beltran-Busto, Narciso Padilla-Martinez, Jose Ferny Mejia-Hoyos, Apolinar Garcia Blan-Quisett, Adelmo Arroyo-Padilla, Alfonso Cardenas-Montilla, Jose Delores Enrique-Teran, Alfonso Javier Meza-Barrios and Eladio Moreno-Sanchez, Defendants-Appellants.**

No. 84–7196.

United States Court of Appeals, Eleventh Circuit.

June 11, 1985.

---

W. Gregory Hughes, Mobile, Ala., for Jose Mari Padilla-Martinez.

Samuel F. Irby, Jr., Mobile, Ala., for Jose Rodrigues-Martinez.

Rose McPhillips, Mobile, Ala., for Carlos Alfonso Beltran-Busto.

Stephen Orso, Mobile, Ala., for Jose Ferny Mejia-Hoyos.

Gary A. Hudgins, Mobile, Ala., for Apolinar Garcia-Blan-Quisett.

Lee Stamp, Mobile, Ala., for Adelmo Arroyo-Padilla.

Al Pennington, Mobile, Ala., for Alfonso Cardenas-Montilla.

Tom Taul, Mobile, Ala., for Alfonso Javier Meza-Barrios.

Ken Slade, Fairhope, Ala., for Eladio Moreno-Sanchez.

William Favre, Thomas H. Figures, Asst. U.S. Attys., Mobile, Ala., for plaintiff-appellee.

Before HENDERSON and HATCHETT, Circuit Judges, and ALLGOOD [*], District Judge.

ALLGOOD, District Judge:

Appellants, Jose Mari Padilla-Martinez, Jose Rodrigues-Martinez, Carlos Alfonso Beltran-Busto, Narciso Padilla-Martinez, Jose Ferny Mejia-Hoyos, Apolinar Garcia Blan-Quisett, Adelmo Arroyo-Padilla, Alfonso Cardenas-Montilla, Jose Delores Enrique-Teran, Alfonso Javier Meza-Barrios and Eladio Moreno-Sanchez, were convicted in the United States District Court for the Southern District of Alabama on charges of possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846 and importation of marijuana in violation of 21 U.S.C. §§ 952(a) and 963.

## Background

During December, 1983, the Coast Guard Cutter UTE was positioned off the Yucatan Channel in the Gulf of Mexico. On the morning of December 21, 1983 there was an aircraft sighting of the vessel NEPTUNE steaming towards the Gulf Coast area and the UTE was directed to intercept her. On the morning of the 22nd the NEPTUNE was sighted by the crew of the UTE riding low in the water and not flying a flag. At the time she was sighted by the UTE, the NEPTUNE was 200 miles due south of Mobile, Alabama, and 250–300 miles north of the Yucatan Peninsula. When radio contact was established between the two vessels, the NEPTUNE reported her last port of call as Barranquilla, Columbia, her next as Mobile and her nationality as the Grand Cayman Islands. The Coast Guard was also told that the

* Honorable Clarence W. Allgood, U.S. District Judge, Northern District of Alabama, sitting by designation.

NEPTUNE carried no cargo and that the captain had left the vessel on a small boat several nights before to get some engine parts.

After receiving the above information and observing the NEPTUNE, the crew of the UTE requested permission to board. The NEPTUNE responded that the Coast Guard could board if permission was granted by the British government. Ultimately that permission was obtained and the NEPTUNE raised a Grand Cayman flag, upside down.

As the boarding team approached the NEPTUNE they could smell marijuana. The crew reported that as they boarded the vessel the odor of marijuana was pervasive, but they did not see any until the cargo holds were opened. The holds, which were covered with canvas and asphalt and tied with ropes, contained approximately 58,000 pounds of marijuana.

The NEPTUNE was taken to the Brookley Field Coast Guard Station in Mobile. The eleven crew members were immediately released to the Drug Enforcement Administration for booking.

A determination was made that the eleven defendants were indigent, an attorney was appointed to represent each one, and arraignment was scheduled for January 12, 1984. At the arraignment, two attorneys from Miami, Arturo Hernandez and Robert S. Shapiro, for themselves and for Robert Garcia-Esquerro, appeared and announced they had or would file an appearance for the defendants. The attorneys from Miami told the court that they had been retained by a third party to represent all eleven defendants. After a hearing, at which the Magistrate questioned the defendants and the Miami attorneys, the request to appear as counsel was denied. Objections to the Magistrate's order and a request for a *de novo* review were filed.

Judge Cox responded to the request by conducting an evidentiary hearing at which all attorneys were present. He questioned the prosecutor, the Miami attorneys, the court appointed attorneys, and three of the defendants in order to resolve any conflict of interest problem. After a thorough inquiry, Judge Cox disqualified the three Miami attorneys, stating that the potential conflicts of interest were obvious and that the defendants were unable to knowingly and intelligently waive such conflicts. The judge also determined that an appeal of that ruling would not automatically stay the trial and the case proceeded as scheduled. A jury found all eleven defendants guilty on both counts and this appeal followed.

Right to Counsel

Although other questions are raised, the crucial issue before this court is the right of the defendants to be represented by attorneys of their choice. On appeal eight of the appellants contend that the trial court erred in disqualifying their retained counsel. They argue that their Sixth Amendment rights were violated and ask that they be given a new trial with representation by the attorneys of their choice.

■ The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." This broad guarantee of counsel has been interpreted to include four rights: the right to counsel, *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the right to effective assistance of counsel, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the right to a preparation period sufficient to insure a minimal level of quality of counsel, and the right to be represented by counsel of one's choice. *Id.* at 70, 62 S.Ct. at 464.

The various components of the right to counsel sometimes conflict. The conflict often arises, as it did here, when two or more defendants choose a single attorney to represent them. In resolving such a conflict, this court has held that while the right to counsel is an absolute right, there is not an absolute right to representation by counsel of one's choice. *United States v. Garrett*, 727 F.2d 1003 (11th Cir.1984), *cert. granted* — U.S. ——, 105 S.Ct. 78, 83 L.Ed.2d 27 (1984); *United States v.*

*Hobson,* 672 F.2d 825 (11th Cir.1982), *cert. denied* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982). The primary reason for this attitude is the potential conflict of interest which can arise from joint representation. The appellants argue that they were informed of possible conflicts, and chose to waive their right to conflict free representation in order to be represented by their retained counsel rather than counsel appointed by the court.

The Fifth Circuit in *United States v. Garcia,* 517 F.2d 272 (5th Cir.1975), said that "defendants enjoy the right to knowingly and intelligently waive any disqualification noted by the district court." *Id.* at 274. The conclusion of the *Garcia* court reflects the limitations established by the Supreme Court in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) and *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), that a waiver of a constitutional right must be an intentional relinquishment or abandonment of a known right, that it must be made knowingly, intelligently and with awareness of the circumstances and the likely consequences of the waiver.

After acknowledging a defendant's right to waive the right to conflict free representation, the *Garcia* court cautioned:

> Because of the unchallenged importance of the need for adequate representation during criminal proceedings, we direct the district court to scrupulously evaluate the insistence of the defendants on the right to privately retained counsel of their choice even though the district court may discern a conflict of interest in such representation. In addition, that court must also carefully evaluate the persistent efforts of the defendants to waive any imperfections in such representation which may be apparent to the court. The trial court should actively participate in the waiver decision.

*Id.* at 277.

When the *Garcia* opinion was rendered, Fed.R.Crim.P. 44, concerning the Right to and Assignment of Counsel, did not address the issue of joint representation and the court of appeals likened the procedure the district court should use in making its determination to that of a Rule 11 procedure. The district court was directed to "seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict . . . ."

Effective December 1, 1980, a new section was added to Rule 44. New section (c) set out guidelines for the court to insure that a defendant's Sixth Amendment rights to effective assistance of counsel are fully protected.

> (c) Joint Representation. Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, *the court shall take such measures as may be appropriate to protect each defendant's right to counsel.* (emphasis added).

In accordance with the procedures set out in Rule 44(c) the trial court conducted a hearing to make a determination about the waivers. At the hearing the court questioned the Miami attorneys about the person who had retained them and the instructions given them. Mr. Garcia-Esquerro testified that he was contacted by an unknown person, by telephone, and asked how much he would charge to represent all of the defendants. He quoted a price and the money was delivered in cash, by a courier, to his office. He also told the court that his loyalty was to the defendants and not the third party who paid his fee. This appears questionable since the decision to

represent the defendants was apparently made prior to talking to any of the defendants. Only by interviewing the defendants could it be determined to what extent each was involved and whether they could effectively be represented by three lawyers who practice together.

The judge also questioned the prosecutor and the court appointed attorneys. The prosecutor admitted that he planned to make a plea bargaining offer to some of the defendants which would include an agreement to testify against other defendants. One of the appointed counsel pointed out that at least one of the defendants was an officer of the ship whereas the majority were only crew members. Also, the court was informed that some of the defendants had prior arrest records and others did not. At the conclusion of this testimony, the court determined that it was unable to find good cause to believe that no conflict of interest would be likely to arise and proceeded to make a determination of whether the defendants could waive the possible conflicts.

In order to evaluate the defendants' understanding of the rights they were willing to waive, the judge began questioning each one individually in chambers. The judge attempted to elicit specific statements from the defendants regarding their understanding of the potential conflicts. After questioning three of the defendants the court determined that they were unable to make the knowing and intelligent waiver required by the Supreme Court. Under ordinary circumstances the court should examine each of the defendants, but in this case the judge had determined that the Miami attorneys had been retained to represent no fewer than all eleven of the defendants.[1] Under the circumstances it was unnecessary to continue the questioning after determining that he could not accept the waivers of three of the defendants.

The Supreme Court has said that "[t]he determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the ac-

1. At the hearing before Judge Cox, the following testimony was given:

The Court: Mr. Garcia-Esquerro, I'm going to ask you to tell me exactly what instructions you received in the telephone conversation which you received relative to representing these defendants.

Mr. Shapiro: Your Honor, before Mr. Garcia-Esquerro answers that question, I would object at this point. I think we have taken this inquiry about as far as it should go and is permissible to go.

We have submitted affidavits to you that a third party has paid our fee. The scope of this inquiry, your Honor, would be to determine if there is any possible conflict of interest in a third party handing out a fee. We are telling you we don't know who he is because we don't know and when we get to that bottom line, you have to make a determination as to whether or not there is a potential conflict of interest.

The ABA standards and as long as the defendants are informed of that and the defendants are informed that our loyalties go to them. I think any inquiry into the matter, with all due respect, your Honor, is improper at this time.

The Court: Why is it improper counsel? How can they decide whether or not there is a

conflict of interest without information relative to what counsel's instructions were from whoever is paying the fee?

Mr. Shapiro: I have noted my objections.

Mr. Garcia-Esquerro: The instructions were if I would represent these defendants and how much would it cost to represent these individuals, and I quoted them a price and they accepted and delivered the money, and engaged Mr. Shapiro and Mr. Hernandez in my office and delivered the money to me. That's it and no other representation or strings attached or nothing.

The Court: And you received no other instructions?

Mr. Garcia-Esquerro: No other instructions, your Honor.

The Court: But your instructions, apparently it includes a desire that you represent all 11 of them.

Mr. Garcia-Esquerro: To represent all 11 of them, yes, sir. And the first time I came in here the first person I visited was Mr. Faure before I went to visit them.

The Court: That at least suggests the possibility that this anonymous third party might consider it to his advantage to have one lawyer represent all 11.

cused." *Johnson v. Zerbst, supra,* 304 U.S., at 464, 58 S.Ct. at 1023. The responsibility for making that determination lies squarely with the trial judge. In order to make a decision the judge must question the defendants. In order to question the defendants the judge must have sufficient information about the surrounding circumstances to be able to inform the defendants of all possible conflicts. In this case the Miami attorneys were, for whatever reason, unable or unwilling to provide the court with the information about who had retained them.[2] This information was needed by the court in order to explain the potential conflicts to the defendants.

■ The evidence presented at the evidentiary hearing clearly indicates that the Miami attorneys could have been, and in all probability were retained, not to fully and fairly represent the eleven defendants, but rather the ship or the party or parties who owned the marijuana—or both. In situations such as this, the decision of the judge to disqualify the retained counsel should not be disturbed unless clearly erroneous. *See, United States v. Hobson,* 672 F.2d 825 (11th Cir.1982).

We do not conceive of how a trial court could ever be put in error for refusing entry into a case by an attorney who either refuses to or is unable to disclose the real party or parties who employed him and the interest he has been employed to protect. The attorneys' own inaction made it unlikely that the defendants could make a knowing and intelligent waiver of the right to conflict free representation. The decision of Judge Cox to disqualify the Miami attorneys is affirmed.

Search and Seizure

Arroyo-Padilla and Mejia-Hoyos contend that the Coast Guard failed to comply with the standards for seizing a foreign vessel as set out in 14 U.S.C. § 89(a).[3] The defendants argue that they were not stopped because of reasonable suspicion of smuggling activity but rather because the Coast Guard had a policy of stopping all ships of foreign registry under 200 feet in length coming through the Yucatan Pass. In support of their argument the defendants cite the Supreme Court case of *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). However, this stopping of all incoming traffic is precisely the recommended alternative to the "standardless and unconstrained seizure" prohibited by the *Prouse* court.

■ Section 89(a) empowers the Coast Guard to search and seize any vessel on the high seas that is subject to the jurisdiction or operation of any law of the United

---

**2.** The Miami attorneys objected to the court's repeated questions about the third party paying their fee. The court made the following statement in response to the objection.

The Court. Well, counsel, let me say this. The only thing that causes me some pause on this matter is this. As I understand it, when the Magistrate asked that question initially the answer was, "We don't know in the sense that we have no information" and then in written papers that had been filed with the court, the statement was, "We don't want to divulge that information," and then today the statement is, "It is in fact an anonymous person."

**3.** 14 U.S.C. § 89, Law enforcement.
(a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

States. The Act does not limit the Coast Guard to the search of domestic vessels, but rather to those "over which the United States has jurisdiction." Thus, merely because a vessel is of foreign registry or outside the territorial waters of the United States does not mean that it is beyond the jurisdiction of the United States. The United States has long taken the position that its jurisdiction extends to persons whose extraterritorial acts are intended to have an effect within the sovereign territory. *United States v. Loalza-Vasquez*, 735 F.2d 153 (5th Cir.1984); *United States v. Cadena*, 585 F.2d 1252 (5th Cir.1978). Section 89(a) was interpreted by the Fifth Circuit in *United States v. Williams*, 617 F.2d 1063 (5th Cir.1980), to require the Coast Guard to have a "reasonable suspicion that those aboard the vessel are engaged in a conspiracy to smuggle contraband into the United States." The NEPTUNE was spotted riding low in the water, and flying no flag. When contacted she reported carrying no cargo, and that the captain had left the vessel several nights before to get some engine parts. Under these facts, grounds for reasonable suspicion existed since the ship was obviously trying to conceal both its identity and activities. When the Coast Guard requested permission to board, they were told they could board if they received permission from the British government. Thus, the permission granted by Great Britain would have provided authorization for the search and seizure even in the absence of the statutory authority granted in § 89(a). *Id.* at 1075.

### James Hearing

■ Enrique-Teran charges that the trial court's failure to conduct an independent hearing pursuant to *United States v. James*, 590 F.2d 575 (5th Cir.1979), *cert. denied* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), is reversible error. The defendant contends that such a hearing was necessary to determine the existence and scope of the conspiracy and to rule on the admissibility of certain hearsay statements that would be introduced against him at trial. While Enrique-Teran com-

plains about the failure of the court to conduct a *James* hearing, he fails to identify what hearsay statements of his co-conspirators were admitted over his objections and were prejudicial to his own case. This court and the Fifth Circuit have stressed that *James* did not establish an inflexible rule that a hearing must be held. *United States v. Monaco*, 702 F.2d 860 (11th Cir. 1983); *United States v. Miller*, 664 F.2d 826, 827 (11th Cir.1981). Rather, the hearing is a tool for the use and assistance of the trial judge. The decision not to hold a *James* hearing in this case is not reversible error.

### Denial of the Requested Severance

■ Under Fed.R.Crim.P. 14, a court is authorized to grant a severance if it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants. *United States v. Salomon*, 609 F.2d 1172, 1175 (5th Cir.1980). The severance decision rests with the sound discretion of the trial judge.

■ In order to show an abuse of discretion by the trial court, the defendant must show that he was unable to obtain a fair trial and suffered compelling prejudice which the trial court was unable to prevent.

Jose Ferny Mejia-Hoyos complains that the trial court erred in not granting his motion for severance because evidence admissible against a co-defendant was also considered against him. He states that this evidence would have been inadmissible against him in a separate trial. He argues further that there was no evidence of a conspiracy other than his mere presence on the vessel, and that the joint trial gave a prejudicial appearance of the existence of a conspiracy. Mejia-Hoyos contends that one of his co-defendants would have taken the stand on his behalf had their cases been tried separately. Thus the denial of severance was an abuse of discretion.

■ Federal Rule of Criminal Procedure 8(b) permits joinder of defendants in a single indictment where they are alleged to have participated in the same transaction

or series of transactions.[4] All eleven defendants were on board the NEPTUNE when it was seized by the Coast Guard. All the defendants set forth lack of knowledge or intent as their defense. This court finds there was no "compelling prejudice" which would have required severance and no abuse of discretion on the part of the trial judge in not granting the severance. See, *United States v. Marszalkowski*, 669 F.2d 655 (11th Cir.1982), *cert. denied* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 167 (1982).

Change of Venue

 Mejia-Hoyos filed a pre-trial motion requesting a change of venue because of the publication of a newspaper article about drug smuggling along the Gulf Coast. The article was published on February 12, 1984 in the Mobile Press Register and the trial was set for February 20, 1984 in Mobile. The defendant contends the article was designed to arouse public sentiment against drug smugglers or those charged with smuggling and as a result there was such prejudice against the defendant that he was unable to obtain a fair and impartial trial. Mejia-Hoyos argues that the denial of his motion for a change of venue amounts to reversible error. These bold assertions are made without any showing that actual prejudice resulted from the publicity. A criminal defendant is not constitutionally entitled to a trial by jurors ignorant of issues and events. *United States v. Fuentes-Coba*, 738 F.2d 1191 (11th Cir.1984), citing *Irvin v. Dowd*, 366 U.S. 717, at 723, 81 S.Ct. 1639, at 1643, 6 L.Ed.2d 751, at 756 (1961). The denial of the defendant's motion was not an abuse of discretion.

Testimony of a Common Scenario

 Paul Benvenuto, a lieutenant in the United States Coast Guard, testified about his experiences on the UTE during the time the NEPTUNE was sighted, intercepted, seized and boarded. Lt. Benvenuto testified that he had been trained at the Coast Guard Academy, had been on board the UTE since July 1982, and had participated in numerous boardings and seizures on the high seas. The court recognized him as an expert in the multi-ton marijuana boat seizures. As an expert, he testified about a common scenario often found in such seizures. The appellants contend that Lt. Benvenuto testified not from first hand experience, but from what he had been told and had read. The lieutenant's training and experience allowed the court to qualify him as an expert who could testify about a common scenario and the court committed no error in doing so.

Sufficiency of the evidence

 Appellant Mejia-Hoyos asserts his conviction was wholly unsupported by either direct or circumstantial evidence. In reviewing the appellant's charge, the court must evaluate the evidence and all reasonable inferences therefrom in a light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and determine whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547 (5th Cir.1982) (en banc), aff'd., 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Applying this standard to the facts of this case, it is obvious that the trial court did not err in submitting the case to the jury. For eight or nine days the appellant was on a ship which was no more than one hundred feet long with 58,000 pounds of marijuana. The odor of the marijuana was so strong that Coast Guard officers testified that they could smell it even before they boarded the ship. There was ample evidence for a jury to find that the

---

**4.** Fed.R.Crim.P. 8(b)

(b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

defendant knowingly and voluntarily participated in a conspiracy to import and distribute marijuana.

Jury Charge

Appellant Garcia-Blan-Quisett requested a specific jury charge dealing with the similarity of conduct among a group of people. The trial judge refused to give the requested charge, saying his charge would cover the case. The defendant contends the charge given by the judge did not adequately cover his requested charge.

 The trial court has broad discretion in formulating a jury charge, "so long as the charge accurately reflects the law and the facts." *United States v. Borders*, 693 F.2d 1318 (11th Cir.1982) *cert. denied* 461 U.S. 905, 103 S.Ct. 1875, 76 L.Ed.2d 807 (1983).

After carefully reviewing the judge's charge, when taken as a whole, it is apparent that the jury was fully informed about the nature of a conspiracy. There was no abuse of discretion on the part of the judge for denying the requested charge.

Jury Request

After the jury began deliberating they sent a note out, requesting individual photographs of the defendants for identification purposes. The court discussed the request with the attorneys. Because some of the attorneys objected to sending pictures to the jury, the judge had the jury return to the courtroom and each of the eleven defendants was asked to stand when his name was called.

Appellants Moreno-Sanchez, Cardenas-Montilla, and Padilla-Martinez contend that asking them to stand and be identified when they had not testified was the same as making them testify against themselves. They claim the presentation of their defense was prejudiced since they were then unable to meet the evidence offered.

The identification of the defendants was not new evidence which called for rebuttal as the defendants claim. Furthermore, all

eleven of the defendants were identified and no one was singled out in any way. We find no error on the part of the trial judge.

Based on all the foregoing reasons, the convictions of the appellants are

AFFIRMED.