JOINER, Judge.
Walter Wallace appeals his conviction for heat-of-passion manslaughter, see § 13A—6—3(a)(2), Ala,Code 1975, and his resulting sentence, as a habitual felony *465 offender, of 30 years’ imprisonment.[1] For the reasons set forth below, we affirm.

Facts and Procedural History

At trial, the State’s evidence tended to establish the following: On the afternoon of November 24, 2012, DeLouis Robinson became upset with Wallace, and she claimed that Wallace owed her money to pay a cellular-telephone bill. Robinson asked her friend, Randall Hayes, to drive her to Wallace’s apartment. According to Lee Griffin—a friend of Hayes and Robinson—Hayes was hesitant to drive Robinson to Wallace’s apartment because Robinson was angry. Griffin testified that, after Robinson calmed down, Hayes drove both Robinson and Griffin to Wallace’s apartment. When they arrived at Wallace’s apartment, Griffin and Hayes remained in Hayes’s car while Robinson walked to Wallace’s apartment. Griffin and Hayes testified that, because Robinson had walked around a building to reach Wallace’s apartment, they could not see either Wallace or Robinson; they could, however, hear them arguing. Hayes testified that, after he heard Wallace and Robinson arguing, he moved his car so that he could see Robinson. Hayes explained:
“That’s when [Robinson] was, like frantic at the time, running around, you know, saying, like, get her something. Get her something. I don’t know what happened between the time of her getting out of my car and going to [Wallace’s] apartment. I don’t know what happened that made her so upset, but by that time she was just frantic, running around looking for something. I don’t know what she was trying to do.”
(R. 65.)
Griffin explained:
“Well, [Robinson and Wallace] were arguing back and forth. So from that point when we seen [Robinson, she]’s like standing in the parking lot. [Hayes] was yelling out the window, like, telling [Robinson] to come on. Because, like, you know, [Robinson and Wallace were] arguing back and forth. That’s the original reason why [Hayes] didn’t want to take [Robinson] from the beginning.
“But, like she—what she said to [Wallace]—she said to him, like, you know, profanity, but she was saying, like, she wasn’t going to use it. And when she said that, that’s when the initial shot went off.
[[Image here]]
“So after that point, [Robinson] ducked. She stood back up and she’s like, you going to shoot me? She said, you know, fing n* * * * * you going to shoot me, and [Wallace] was running towards the car, you know.
[[Image here]]
“So [Wallace] came around the car, [Robinson] turned around to him and that’s when he was, like, close up on her face and he shot her in the face.”
(R. 41-43.) Griffin testified that, after he witnessed Wallace shoot Robinson in the face, he heard approximately three more gunshots. Hayes testified that, after Wallace first shot Robinson, “he stood over her and he shot her again ... maybe like, 2 or 3 more times.” (R. 71.) Both Griffin and Hayes testified that they did not see Robinson with a weapon that day.
Officer Chris Coleman, an evidence technician with the Birmingham Police Department, testified that, at the scene of the shooting, he observed a pool of blood, a hat with what appeared to be blood on it, two *466 live rounds, and three shell casings. Officer Coleman testified, however, that no weapons were recovered from the scene.
Officer Mitch Rector, a firearm and tool-marks examiner with the Birmingham Police Department, testified that he received two live “.45 auto caliber” cartridges and three feed “.45 auto caliber” cartridge casings that were collected from the scene of the shooting. Officer Rector testified that “the [three] fired cartridge cases ... had all been fired from the same firearm” and that the live rounds and the cartridge cases “all had a similar marking that indicated they were made by the same manufacturer.” (R. 256.)
Detective Talana Brown with the Birmingham Police Department testified that she never received any information indicating that Robinson was in possession of a gun or any other type of weapon that evening and that, as a result of her investigation, she concluded that Wallace was not justified in using deadly force to defend himself against Robinson.
Dr. Gary Simmons, a medical examiner with the Jefferson County Coroner’s Office, testified that he performed an autopsy on Robinson on November 25, 2012. Dr. Simmons testified that Robinson suffered five gunshot wounds—three to her extremities, one to the left side of her jaw, and one that entered the left side of her back and exited the right side of her chest. Dr. Simmons testified that he collected a small projectile from a wound in Robinson’s arm and another projectile from her jaw. Dr. Simmons testified that Robinson was shot from a distance of, at most, three feet away.
After the State rested its case, Wallace testified in his own behalf. According to Wallace, on the afternoon of November 24, 2012, he received the following series of threatening text messages from Robinson:
• At 4:00 P.M.: “B* * * *, you so dirty, ho. You can get this phone ho and give me my money back.”
• At 4:01 P.M.: “That’s f* * * * * up, b* * * *t i ⅞⅛⅛ did s* * * to you, ho. You going to do me like that?”
• At 4:03 P.M.: “Just give me my money back. If you do not, you ain’t going to like me, or you’re going to hate me, b* * * *. I am telling you the wrong b* * *
• At 4:04 P.M.: “B* * * b* * * *, Jq'H ⅜ ⅜ ⅜
• At 4:05 P.M.: “B* * * *, I’m going to kill [you], ho, on my kids.”
(R. 337-41; C. 336-40.) Wallace testified that, after she sent him the text messages, Robinson telephoned him and that, when he did not answer, she left him a threatening voicemail. Wallace testified that, after he listened to Robinson’s voicemail, he was “terrified” and “scared” and “stayed in the house.” (R. 344.)
Wallace testified that, later that evening, Robinson arrived at his apartment and began banging on his door. Wallace testified that, when he opened the door, Robinson “was still yelling and in a terrible rage.” (R. 346.) Wallace testified that he gave Robinson $70 and that she threw her phone on the sidewalk. Wallace testified:
“[Wallace]: [Robinson] stayed in a rage. Just kept fussing. I’m like to myself, I gave you the money to get you another phone.
“[Wallace’s counsel]: Did you ever say that to her?
“[Wallace]: Yes.
[[Image here]]
“[Wallace’s counsel]: What were you doing while she was in the rage?
“[Wallace]: I was just—I was just—I was just shocked, you know what I’m saying? To be honest, I just couldn’t believe this is what—you know what I’m *467 saying, she stayed in a rage and the person give you some money to get from your house.
“[Wallace’s counsel]: And were you telling her to get—
[[Image here]]
“[Wallace]: I’m telling her to get on. So I shot a warning shot, sir.
“[Wallace’s counsel]: When you say you shot a warning shot, what do you mean by that?
“[Wallace]: I shot a warning shot behind my back, though.
“[Wallace’s counsel]: When you shot that warning shot, where were you aiming the pistol?
“[Wallace]: Up in the air, sir.
[[Image here]]
“[Wallace’s counsel]: And when you shot in the air, did she take off running?
“[Wallace]: I shot and she said—she said—exactly these are the words she said: ‘That ain’t scare me, b* * * *,’ and she just took out, out of sight.
[[Image here]]
“[Wallace’s counsel]: Okay. All right. Now at that point—so you couldn’t see her anymore?
“[Wallace]: No sir.
“[Wallace’s counsel]: All right. Could you hear anything?
“[Wallace]: Yes, I still heard her voice in a rage still, sir.
“[Wallace’s counsel]: What was she doing—or what could you hear?
“[Wallace]: The most words I really understood is just b* * * * * * and ho’s pretty much. You know, ‘I’m going to get you, n* * * * *.’ ”
(R. 347-50.) Wallace testified that he “stalled for a minute to see if she was out of sight” and that he began “[w]alking to see if she [was] gone.” (R. 352.) Wallace testified that, as he walked toward the parking lot, he observed Robinson, who had been hiding behind a car, “coming up with a pistol” and saying, “I’m going to kill you, b* * * (R. 353-54.) Wallace testified that he was surprised and terrified and that he was unable to run away from Robinson. Wallace testified that, based on the threats Robinson had made to him earlier that day, he believed his life was in danger, and, therefore, he asserted, he shot Robinson in self-defense. When asked why he shot Robinson so many times, Wallace stated, “[B]ecause the kind of gun I had is a .45 with no safety on it.” (R. 356.) Wallace testified that, after he shot Robinson, he and his son fled his apartment because Wallace was concerned for their safety. Wallace testified that he turned himself in to police the next day. Wallace confirmed that he is a felon and that he knew he was not permitted to possess a firearm. Wallace testified that he lived in a bad neighborhood and that he kept a gun in his home to protect himself and his children.
Frank Slapikas also testified in Wallace’s behalf, explaining that Wallace had hired him as a private investigator. Slapi-kas explained that, on March 4, 2014, he interviewed Hayes about the shooting and Hayes stated that, during that incident, Robinson said to Hayes, “Give me something, I’m fixing to kill this b* * * *. He don’t want to give me my money,” and that, after saying so, Robinson picked up a brick. (R. 291.)
After the defense rested, the trial court conducted a jury-charge conference. During that conference, the parties discussed the State’s instruction regarding the law of self-defense—specifically, the instruction that, “[t]o sustain a claim of self-defense, it is necessary that the following conditions be established: (1) that the accused was in actual or apparent peril; (2) that the accused was unable to retreat; and (3) that *468 the accused was free from fault in bringing on the difficulty.” (C. 184.) The trial court, relying on this Court’s decision in Kidd v. State, 105 So.3d 1261 (Ala.Crim. App.2012), concluded that, if the defendant claiming self-defense was, at the time of the shooting, a convicted felon in possession a firearm, he has a duty to retreat because he is engaged in “unlawful activity” and is not “free from fault.”
Wallace objected to the trial court’s conclusion and argued that the correct application of the law with regard to a defendant’s duty to retreat is not whether he was free from fault, but, rather, whether he was the initial aggressor. The trial court overruled his objection. Wallace then argued that he should be “immune from prosecution as a result of the self-defense,” and the trial court replied that, in accordance with Kidd, the immunity provided by “the stand your ground [law] doesn’t necessarily apply to [Wallace] in the area of being free from fault since he was a convicted felon in possession of a firearm.” (R. 436-37.)
The trial court then charged the jury with respect to self-defense, in pertinent part, as follows:
“Ladies and gentlemen, a defendant is not justified in using deadly physical force upon another person, and cannot prevail on the issue of self-defense if it reasonably appears, or the defendant knows that he can avoid the necessity of using such force with complete safety by retreating, except that the defendant is not required to retreat if he is in his dwelling or at his place of work and was not the original aggressor.
[[Image here]]
“Now, some essential elements of self-defense are: 1, that the defendant must be free from fault. That is, he must not have said or done anything for the purpose of provoking the difficulty. Nor must he be disregardful of the consequences in this respect of any wrongful word or action.
[[Image here]]
“Ladies and gentlemen, to sustain a claim of self-defense it is necessary that the following conditions be established:
“1) that the accused or the defendant was in actual or apparent peril.
“2) that the defendant was unable to retreat.
“3) that the defendant was free from fault in bringing on the difficulty.
[[Image here]]
“Remember, that the party invoking the doctrine of self-defense must be entirely free from fault. ”
(R. 491-96; emphasis added.) Wallace again objected to this instruction after the trial court charged the jury. Thereafter, the jury found Wallace guilty of heat-of-passion manslaughter as a lesser-included offense of murder. Wallace then filed a motion for a new trial, which the trial court denied. Thereafter, Wallace filed a timely notice of appeal.

Discussion

On appeal, Wallace contends only that the trial court committed reversible error when it refused to instruct the jury on Alabama’s “stand-your-ground” law. Specifically, Wallace argues that the trial court erroneously reasoned that, because Wallace was a convicted felon in possession of a firearm,[2] he was engaged in “unlawful *469 activity” at the time he shot Robinson and was, therefore, not entitled to the “stand-your-ground” instruction.
This Court has stated:
“ ‘A trial court has broad discretion in formulating its jury instructions, provided they are an accurate reflection of the law and facts of the case. United States v. Padilla-Martinez, 762 F.2d 942 (11th Cir.1985). However, a “defendant is entitled to have the court instruct the jury on his defense theory, ‘assuming that the theory has foundation in the evidence and legal support.’ United States v. Conroy, 589 F.2d 1258, 1273 (5th Cir.1979).” United States v. Terebecki, 692 F.2d 1345, 1351 (11th Cir.1982). In order to determine whether the evidence is sufficient to necessitate an instruction and allow the jury to consider the defense, “we must accept the testimony most favorably to the defendant.” (Citations omitted.) United States v. Lewis, 592 F.2d 1282, 1286 (5th Cir. 1979).’
“Coon v. State, 494 So.2d 184, 186 (Ala. Crim.App.1986).
“Before 2006, Alabama’s self-defense statute addressed deadly force in defense of self, as well as the duty to retreat, as follows:
“ ‘(b) ... [A] person is not justified in using deadly physical force upon another person if it reasonably appears or he knows that he can avoid the necessity of using such force with complete safety:
“‘(1) By retreating, except that the actor is not required to retreat:
“ ‘a. If he is in his dwelling or at his place of work and was not the original aggressor....’
“Effective June 1, 2006, however, § 13A-3-23, Ala.Code 1975, was amended to provide:
“‘(a) A person is justified in using physical force upon another person in order to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he or she may use a degree of force which he or she reasonably believes to be neeessary for the purpose. A person may use deadly force, and is legally presumed to be justified in using deadly physical force in self-defense or the defense of another person pursuant to subdivision (4), if the person reasonably believes that another person is:
“ ‘(1) Using or about to use unlawful deadly physical force.
[[Image here]]
“ ‘(b) A person who is justified under subsection (a) in using physical force, including deadly physical force, and who is not engaged in an unlawful activity and is in any place where he or she has the right to be has no duty to retreat and has the right to stand his or her ground.’ ”
George v. State, 159 So.3d 90, 93-94 (Ala. Crim.App.2014) (emphasis added).
During the jury-charge conference, the parties discussed, outside the presence of the jury, whether Wallace was entitled to an instruction on the stand-your-ground portion of the self-defense statute. The State argued that, because Wallace was a convicted felon in possession of a firearm, *470 Wallace was engaged in “unlawful activity” and, therefore, could not avail himself of the stand-your-ground instruction; the trial court agreed.
“We addressed a similar scenario in Williams v. State, 46 So.3d 970 (Ala. Crim.App.2010). In Williams, the trial court gave the following instruction on self-defense, which is nearly identical to the instruction given in this case:
“ ‘ “The Defendant is not justified in using deadly physical force upon another person, and cannot prevail on the issue of self-defense if it reasonably appears or the Defendant knows that he can avoid the necessity of using such force with complete safety by retreating, except that the Defendant is not required to retreat if he is in his own dwelling or was not the initial aggressor.” ’
“46 So.3d at 970. This Court reversed Williams’s conviction and sentence, concluding that ‘[t]he trial court’s self-defense instruction did not substantially cover the language set forth in the amended version of § 13A-3-23(b)’ and that ‘the instruction was an incorrect statement of law, and [that] the trial court erred when it refused to reinstruct the jury regarding the right to stand one’s ground pursuant to the current version of § 13A-3-23(b), Ala.Code 1975.’ Williams, 46 So.3d at 971.”
George, 159 So.3d at 94.
In the present case, the State concedes that, “[t]hough the trial court gave a jury charge on self-defense, the charge explained the law of self-defense in terms of the pre-June 1, 2006, duty to retreat.... It also failed to include an instruction on the post-June 1, 2006, [§ ] 13A-3-23(b), ‘stand your ground’ provisions.” (State’s brief, pp. 10-11.) The State contends, however, that “this hybrid charge was justified. And, even if there was error in such a hybrid charge, the error was harmless to Wallace’s defense.” (State’s brief, p. 11.) Specifically, the State argues that Wallace was the initial aggressor and was neither eligible to stand his ground nor entitled to any self-defense instruction.
In support of its position at trial, however, the State relied upon this Court’s decision in Kidd v. State, 105 So.3d 1261 (Ala. Crim.App.2012). In Kidd, the State argued at trial that, because Kidd was a felon in possession of a firearm, he was engaged in “unlawful activity” that imposed upon him a duty to retreat under § 13A-3-23(b). Id. Kidd—who, like Wallace, “admitted that, at the time of the shooting, he was a convicted felon and was aware that he was violating the law by carrying a gun”—argued that “the trial court’s jury instruction regarding self-defense was misleading because, he said, it was contrary to the plain language of § 13A-3-23(b).” Id. at 1262. This Court rejected Kidd’s argument and held that “ § 13A-2-23(b) imposed a duty to retreat upon Kidd” because his “unlawful possession of the firearm [had] contributed to the argument that eventually led to the shooting.” Id. at 1264.
This Court later stated, however, that,
“[although this Court in Kidd held that Kidd had a duty to retreat under § 13A-3-23, that holding followed this Court’s conclusion that Kidd’s argument was not properly presented on appeal. Thus, this Court’s interpretation of § 13A-3-23, Ala.Code 1975, in Kidd was not essential to the judgment in that case. See Ex parte Williams, 838 So.2d 1028, 1031 (Ala.2002) (‘Because obiter dictum is, by definition, not essential to the judgment of the court which states the dictum, it is not the law of the case established by that judgment.’).”
George, 159 So.3d at 95 n. 7.
To support his claim on appeal that the trial court should have instructed the *471 jury on “stand your ground,” Wallace cites our recent decisions in Diggs v. State, 168 So.3d 166 (Ala.Crim.App.2014), and its companion case, Johnson v. State, 168 So.3d 163 (Ala.Crim.App.2014),[3] to demonstrate that the discussion in Kidd regarding § 13A-3-23(b) is not controlling precedent under the circumstances of the instant case. Wallace’s reliance on Diggs and Johnson, however, is misplaced.
In Diggs, this Court held that
“a felon is not deprived of the right to use a firearm against the immediate need to defend his life.
““‘[W]hen a felon is in imminent peril of great bodily harm, or reasonably believes himself or others to be in such danger, he may take possession of a weapon for a period no longer than is necessary or apparently necessary to use it in self-defense, or in defense of others. In such a situation justification is a defense to the charge of felon in possession of a firearm.” ’
“Ex parte Taylor, 636 So.2d 1246, 1247 (Ala.1993) (quoting State v. Blache, 480 So.2d 304 (La.1985)). Diggs’s possession of a firearm before his need to defend his life may have been an event in violation of the law. However, his possession of a firearm was justified at the moment it became necessary for his self-defense.
“Because Diggs presented evidence in support of his self-defense claim, the trial court erred when it refused to give the requested instruction to the jury.
“ ‘As our Supreme Court aptly stated decades ago, “However unsatisfactory and inconclusive to the judicial mind, yet there was some proof affording tendencies in support of this plea. The inferences to be drawn therefrom were for the jury, and not the court. We feel impelled therefore to pronounce this action of the court as error to reverse.” ’
“Mordecai v. State, 868 So.2d [993], 998 [ (Ala.Crim.App.2003) ] (quoting Burns v. State, 229 Ala. 68, 70, 155 So. 561, 562 (1934))....”
Diggs v. State, 168 So.3d at 162.
Similarly, in Johnson, we held:
“The State further argues that Diggs was engaged in an unlawful activity because he is a convicted felon who armed himself with a deadly weapon. The State contends that, based on this unlawful activity, Diggs’s presence at the club was unlawful and, therefore, negated Diggs’s claim of self-defense. In Ex parte Taylor, 636 So.2d 1246 (Ala.1993), our Supreme Court recognized that a felon is not completely deprived of his right to possess a firearm when in immediate need to defend his life. Specifically, the Court in Taylor held that, •when a felon is in imminent peril of great bodily harm, or reasonably believes himself or others to be in such danger, he may take possession of a weapon for a period no longer than is necessary ... to use it in self-defense.’ 636 So.2d at 1247. In the instant case, evidence presented at trial established that Bowen told Diggs that Blackwell had a gun and that Blackwell had said that he was going to ‘bury1 him. Diggs’s testimony, if believed by the jury, indicated that Diggs used the firearm in defense of his life.”
Johnson, 168 So.3d at 168.
Contrary to Wallace’s position on appeal, neither Diggs nor Johnson stands for *472 the proposition that a convicted felon in possession of a firearm may avail himself of the “stand-your-ground” portion of the self-defense statute. Indeed, in Fuller v. State, [Ms. CR-14-0368, Dec. 18, 2015] — So.3d-,-(Ala.Crim.App.2015)—an opinion that this Court is releasing the same day as this opinion—this Court explains:
“In the present case, Fuller urges this Court to follow Diggs. Fuller argues that his possession of a firearm before the altercation that led to Witherspoon’s death might have been an event in violation of the law; however, he asserts, based on the testimony of Fuller and Smoot, his possession of a firearm was justified, and thus was not an ‘unlawful activity,’ at the moment it became necessary for his self-defense. Therefore, Fuller argues that, in addition to the instruction on self-defense under 13A-3-23(a), Ala.Code 1975, he was entitled to an instruction under § 13A-3-23(b), Ala. Code 1975, informing the jury that, if he was justified under subsection (a) in using physical force, he had no duty to retreat.
“There is language in Diggs that seems to support Fuller’s argument. However, the language in Diggs concerning the defendant’s duty to retreat was unnecessary and, thus, was merely dicta. Unlike the present situation, in Diggs the trial court erroneously refused to give any instruction to the jury concerning the defendant’s right to defend himself under § 13A-3-23(a), Ala.Code 1975. That error alone warranted reversal of the trial court’s judgment. It was unnecessary for this Court to analyze the separate issue concerning the limited right of a person to ‘stand his or her ground’ if that person is ‘justified under subsection (a) in using physical force,’ see § 13A-3-23(b), Ala.Code 1975.”
(Emphasis added.) In other words, the reversible error in Diggs and Johnson was the trial court’s failure to give a self-defense instruction under § 13A-3-23(a), not the trial court’s failure to give a “stand-your-ground” instruction under § 13A-3-23(b).
Here, unlike in Diggs and Johnson, the trial court instructed the jury on self-defense. Thus, Diggs and Johnson are inapplicable in this case. Therefore, the question we must address, and the question that Wallace asks this Court to decide, is whether, under the facts of this case, the trial court erred when it did not charge the jury with regard to the “stand-your-ground” component of Alabama’s self-defense law, which is set forth in § 13A-3-23(b), Ala.Code 1975. Specifically, this case turns on whether a convicted felon in possession of a firearm is engaged in “unlawful activity” under the stand-your-ground provision of the self-defense statute.
We address this precise question in Fuller as follows:
“In the present case, the issue whether Fuller, the defendant, was entitled to a ‘no-duty-to-retreat’ instruction is squarely before us. Specifically, the issue whether Fuller was ‘engaged in an unlawful activity’ under § 13A-3-23(b), Ala.Code 1975, is squarely before us. Fuller urges this Court to follow the dicta set forth in Diggs. However, in the present case, we hold that the trial court did not commit reversible error when it ruled that Alabama’s ‘stand-your-ground’ law did not apply because Fuller was engaged in unlawful activity.
“Section 13A-3-23(b) provides a qualified exception to the common-law rule that required a person to retreat rather than use deadly physical force if that person can retreat without increasing *473 his or her peril. See Kyser v. State, 513 So.2d 68 (Ala.Crim.App.1987) (setting forth the standard concerning a person’s duty to retreat under the common law and under a prior version of § 13A-3-23). Section 13A-3-23(b) exempts people who are not engaged in an unlawful activity and are in any place where they have the right to be from the common-law rule.
“To support its holding, Diggs relied on Ex parte Taylor, 636 So.2d 1246 (Ala. 1993). Unlike the present situation or the situation in Diggs, in Taylor the issue was ‘whether § 13A-11-72, Code of Ala.1975, which prohibits a convicted felon from possessing a pistol, is a strict liability statute or whether a convicted felon who is charged with possessing a firearm may raise the defense of self-defense.’ Ex parte Taylor, 636 So.2d at 1246, That case did not consider whether a defendant had no duty to retreat under § 13A-3-23(b).
[[Image here]]
“To support its holding, Diggs quoted Taylor, quoting in turn [State v.] Blache, [480 So.2d 304 (La.1985)], as follows:
“ ‘ “ ‘[W]hen a felon is in imminent peril of great bodily harm, or reasonably believes himself or others to be in such danger, he may take possession of a weapon for a period no longer than is necessary or apparently necessary to use it in self-defense, or in defense of others. In such a situation justification is a defense to the charge of felon in possession of a firearm.’ ” ’
“Diggs, 168 So.3d at 162, quoting Ex parte Taylor, 636 So.2d at 1247, quoting in turn Blache, 480 So.2d 304.
“This statement should be the rule regarding self-defense. Specifically, ... at the moment when a person who is otherwise unable to lawfully possess a weapon finds himself or herself in imminent peril of great bodily harm, he or she should be able to lawfully take possession of a weapon at that moment and use it for a period no longer than is necessary or apparently necessary to use it in self-defense. Recognizing this rule simply recognizes the defense of justification or necessity.
“On the other hand, a person should not be able to unlawfully take possession of a weapon well before an altercation occurs, enter circumstances that may result in a violent confrontation, use that weapon in a violent altercation, and then avail himself or herself of the ‘no-duty-to-retreat’ right created by § 13A-3-23(b). In such a situation, the defendant is engaged in unlawful activity before it becomes necessary to do so. As such, the defendant who is illegally in possession of a firearm should be required to retreat, if retreat is possible.
“Under Taylor, if a person who cannot otherwise lawfully possess a weapon arms himself or herself in self-defense, he or she can raise the defense of self-defense to a charge that he or she unlawfully possessed a weapon. As Taylor held, unlawful possession of a firearm is not a strict-liability offense. However, Taylor did not consider whether such a person has a duty to retreat if possible, and there is no indication in § 13A-3-23 that the legislature meant to exempt such a person from duty under the common law to retreat if possible. In fact, the opposite is true. The legislature explicitly excluded people ‘engaged in an unlawful activity’ from the newly established ‘no-duty-to-retreat’ right. Frankly, we see the wisdom in not allowing violent felons to proactively arm themselves and then avail themselves of the stand-your-ground law when they enter a situation in which violence is likely and *474 use the weapon that they are unlawfully possessing to take human life. A felon who -is barred from possessing a gun should be able to act in self-defense, but he or she should also have to retreat if possible.
“If a person enters a situation engaged in an unlawful activity that in anyway relates to or contributes to the situation, that person cannot avail himself or herself of the ‘no-duty-to-retreat’ right created by § 13A-3-23(b). This Court previously alluded to this understanding of the law in Kidd v. State, 105 So.3d 1261 (Ala.Crim.App.2012)....
“In the present case, Fuller unlawfully possessed a firearm before he drove by the house where [the victim] was located and the altercation occurred. He then used that firearm in the altercation. We hold that Fuller was not entitled to an instruction under § 13A-3-23(b), Ala.Code 1975, informing the jury that, if he was justified under subsection (a) in using physical force, he had no duty to retreat. We certainly do not believe the Alabama Legislature intended to avail armed violent felons of its stand-your-ground law. Accordingly, this Court holds that the trial court did not commit reversible error when it ruled that Alabama’s ‘stand-your-ground’ law did not apply because Fuller was engaged in unlawful activity.”
— So.3d at—.
Likewise, here, Wallace unlawfully possessed a firearm when he left his apartment, searched for Robinson in the parking lot of the apartment complex, and, ultimately, used that firearm to shoot Robinson. Although Wallace may have been entitled to a self-defense instruction under § 13A-3-23(a), see Diggs, supra, and Johnson, supra, Wallace was not entitled to a “stand-your-ground” instruction under § 13A-3-23(b) because he was engaged in unlawful activity. Thus, the trial court did not err when it instructed the jury that Wallace had a duty to retreat.
Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH, KELLUM, and BURKE, JJ., concur.

. Wallace was originally indicted for murder, see § 13A-6-2, Ala.Code 1975, but was convicted of heat-of-passion manslaughter as a lesser-included offense.

. Wallace concedes that it is unlawful for him to possess a firearm under § 13A-ll-72(a), Ala.Code 1975, which provides that "[n]o person who has been convicted in this state or elsewhere of committing or attempting to commit a crime of violence shall own a pistol or have one in his or her possession or under his or her control.” Indeed, the record on *469 appeal demonstrates that Wallace has, at least, four prior felony convictions for first-degree robbery, an offense that "is a crime of violence within the meaning of that term as it is used in” § 13A-ll-72(a). See Bell v. State, 47 Ala.App. 516, 518, 257 So.2d 375, 377 (Ala.Crim.App. 1972).

. "Johnson and his brother, Ellis Andrei Diggs, were tried jointly for the murder of Garry Blackwell.” Johnson, 168 So.3d at 165.